IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

HICKORY HILLS FOODMART, INC.,
d/b/a, Hickory Hills Shell
Station,

              Plaintiff,

     v.

EQUILON ENTERPRISES, LLC
d/b/a Shell Oil Products US,

              Defendant.

Case No. 22 C 5393

Judge Harry D. Leinenweber

MEMORANDUM OPINION AND ORDER

The Court grants in part and denies in part Defendant's Motion to Dismiss. The Court grants Defendant's Motion to Dismiss Counts II, III and IV, and denies Defendant's Motion to Dismiss Count I.

I.    BACKGROUND

This case arises from a contract dispute between Plaintiff Hickory Hills Foodmart, Inc. d/b/a Hickory Hills Shell Station ("Hickory Hills"), and Defendant Equilon Enterprises, d/b/a Shell Oil Products US ("Shell"). The Complaint alleges the following facts.

In or around 2010, on behalf of Plaintiff, Abdul Basit ("Basit"), Mahmood G. Lakha ("Lakha"), and Mohamad Yakoob ("Yakoob") allegedly met with two individuals regarding the

formation of a Shell brand fuel distribution company in Cook County — Mark Osiecki ("Osiecki") and Robert Stambolic ("Stambolic"). (Dkt. No. 1-1. ("Compl.") ¶¶ 5-6.) Osiecki was a Shell brand territory manager, and Stambolic owned and operated RS Fuel, a Shell brand fuel distributor in the Chicago area. (*Id*. ¶ 6.) Though Plaintiff's Complaint does not explicitly allege Osiecki was authorized to enter into a binding agreement on behalf of Shell, the Court does not find this issue to be in dispute and for purposes of this opinion assumes Osiecki maintained such authority.

Osiecki and Stambolic informed Plaintiff of an abandoned Shell property for sale located near heavy traffic. (*Id*. ¶¶ 7-8.) Osiecki also represented that Shell planned to sell the property with a deed restriction requiring the fuel station on the property to exclusively sell Shell-branded fuel for the next twenty years. (*Id*. ¶ 9.) According to Osiecki, whoever bought the property would be responsible for developing a Shell branded gas station. (*Id*. ¶ 10.) This would include remodeling of the property, purchasing and operating Shell-branded fuel pumps, advertising Shell, upgrading the underground storage tank system, and purchasing Shell-branded fuel through Shell wholesalers. (*Id*. ¶¶ 10-11.) In exchange, Shell represented to Plaintiff that Shell would provide the buyer of the property with the same Shell corporate protections it provides all its franchisees, including territorial protections

- 2 -

to safeguard against unfair competition with other Shell branded fuel stations. (*Id.* ¶¶ 14, 77.) Shell's territorial policy does not permit competing Shell stations to open within close proximity of an existing Shell branded station unless Shell determines through traffic pattern studies and customer flow studies that the existing Shell will not be detrimentally impacted. (*Id.* ¶ 15.) Osiecki and Stambolic proposed that Plaintiff purchase the property and develop the new Shell fuel station. (*Id.* ¶ 17.) They also proposed that Plaintiff enter into a fuel supply agreement with RS Fuel to distribute Shell brand fuel at the new fuel station. (*Id.*)

Plaintiff, Shell, and RS Fuel allegedly came to an agreement in 2010. (*Id.* ¶ 20.) Plaintiff agreed to the terms of what it allegedly believed was a franchise agreement with Shell and entered into a fuel supply agreement with RS Fuel. (*Id.* ¶ 18.) Plaintiff also entered into a lease agreement with RS Fuel while the property underwent repairs. (*Id.* ¶ 18.) After significant rehabilitation efforts, Plaintiff's fuel station began operations. (*Id.* ¶ 23.) Plaintiff then bought the property from RS Fuel. (*Id.* ¶ 24.) The purchase included a restrictive deed that prohibited Plaintiff from selling non-Shell branded fuel through 2030, which was later extended to 2033. (*Id.* ¶¶ 20, 25.) RS Fuel was sold or otherwise acquired by Parent Petroleum after entering the fuel supply

agreement with RS Fuel, but Parent Petroleum assumed its rights and obligations under the agreement. (*Id.* ¶ 19.)

During the next ten years of the property's operations, Plaintiff continued to invest in the property, and estimates the value of the property by January 2021 to be $1.5 million. (*Id.* ¶ 26.) During these years, Plaintiff allegedly performed its obligations as required under the franchise agreement, including accepting credit cards on the Shell network only, using Shell's Point of Sale ("POS") software at the credit card processors at each fuel pump, and directing a portion of the credit card sales at Plaintiff's station to Defendant every month. (*Id.* ¶¶ 32, 33, 37.) Plaintiff also allegedly performed the various obligations it was required to undertake in order to use Shell branded advertising, signage, and trademarks, including honoring Shell-promoted discounts, sales, and promotions, and keeping its station in an orderly condition acceptable to Shell inspectors. (*Id.* ¶¶ 35-37.) During these years, Shell allegedly treated Plaintiff in the same material manner as it treated its other franchisees. (*Id.* ¶ 40.)

In or around March 2021, Plaintiff discovered that Shell, with sole discretion to do so, authorized a competing Shell fuel station to open about a quarter of a mile from Plaintiff's station, despite Osiecki's representation that Shell would provide

Plaintiff with territorial exclusivity. (*Id*. ¶¶ 14, 48–49, 64.) Upon learning of this, Plaintiff sent Shell a letter detailing the damage the competing Shell would cause to Plaintiff's business and property value. (*Id*. ¶ 55.) Plaintiff also allegedly spoke with an agent of Parent Petroleum about the expected damage. (*Id*. ¶ 56.) The competing station was eventually built and included a car wash and liquor license — neither of which Plaintiff's station had — more fuel pumps and was situated closer to the major highway than Plaintiff's station. (*Id*. ¶¶ 50–51, 58.) Shell allegedly did not undergo any traffic pattern studies and customer flow studies that they perform prior to authorizing competing Shell stations to open. (*Id*. ¶ 71.) Plaintiff kept its fuel prices identical to those at the competing Shell, but nevertheless has lost half of its gross fuel sales volume since the competing station opened. (*Id*. ¶ 54.)

On October 3, 2022, Plaintiff filed a four-count Complaint in this Court, alleging breach of contract, violations of the Illinois Consumer Fraud Act, tortious interference, and breach of fiduciary duty. (Dkt. No. 1.) On October 24, 2022, Defendant moved under Federal Rule of Civil Procedure 12(b)(6) to dismiss all four claims. (Dkt. No. 10.) On January 25, 2023, Defendant filed a supplemental memorandum in support of its Motion to Dismiss. (Dkt. No. 24.) The Court now decides the Motion.

## II.  <u>LEGAL STANDARD</u>

"A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) challenges the viability of a complaint by arguing that it fails to state a claim upon which relief may be granted." *Camasta v. Jos. A. Bank Clothiers, Inc.,* 761 F.3d 732, 736 (7th Cir. 2014); *see also Hill v. Serv. Emp. Int'l Union,* 850 F.3d 861, 863 (7th Cir. 2017). Pursuant to Rule 8(a)(2), a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). Under the federal pleading standards, a plaintiff's "factual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 545 (2007). Put differently, a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).

## III. <u>DISCUSSION</u>

As an initial matter, the Complaint does not discuss what law applies to the state law claims. However, Defendants assess the claims under Illinois law and the Plaintiff does not dispute the application of Illinois law. Under Illinois choice-of-law rules, the forum law applies "unless an actual conflict with another state's law is shown, or the parties agree that forum law does not

apply." *Sosa v. Onfido, Inc.*, 8 F.4th 631, 637 (7th Cir. 2021) (quoting *Gunn v. Cont'l Cas. Co.,* 968 F.3d 802, 808 (7th Cir. 2020)). Because the parties do not dispute the application of Illinois law and the Court identifies no conflicts with it, the Court applies Illinois law to the present action. The Court also acknowledges that, due to the state residences of the parties and the amount in controversy, it maintains diversity jurisdiction in this case. *See* 28 U.S.C. 1332; Dkt. No. 1 ¶¶ 2-4.

### A. Count I – Breach of Contract

Under Illinois law, "to properly plead a cause of action for breach of contract, a plaintiff must allege the essential elements, which are: (1) the existence of a valid and enforceable contract; (2) performance by the plaintiff; (3) breach of the contract by the defendant; and (4) resultant injury to the plaintiff." *Gonzalzles v. Am. Express Credit Corp.,* 733 N.E.2d 345, 351 (Ill. App. Ct. 2000). The parties primarily dispute the first element.

Plaintiff pleads that Defendant Shell breached its contract with Plaintiff when it failed to perform the necessary tests and evaluations it is allegedly required to undertake prior to authorizing the opening of a competing Shell brand fuel station in close proximity to an existing Shell franchisee. (Compl. ¶¶ 70-71.) Plaintiff alleges that Osiecki, on behalf of Shell, entered into an oral franchise agreement with Plaintiff in 2010. (*Id.* ¶¶ 7,

- 7 -

18.) Plaintiff also argues the parties formed an implied franchise contract in-fact as evidenced by the circumstances surrounding the agreement and general course of dealing. (Mot. at 4.) Because one cannot ordinarily recover under both an oral and implied contract, as both cannot coexist with respect to the same subject matter, the Court will assess the claims of implied-in-fact and oral contracts separately. *Kurt v. Platinum Supplemental Ins., Inc.,* 2021 WL 3109667, at *4 (N.D. Ill. July 22, 2021).

The only difference between an express contract and an implied contract is that an implied contract is "inferred from the conduct of the parties, rather than from an oral or written agreement." *Hernandez v. Illinois Institute of Technology,* 63 F.4th 661, 667 (7th Cir. 2023) (citing *BMO Harris Bank, N.A. v. Porter,* 106 N.E.3d 411, 421 (Ill. App. Ct. 2018)). Plaintiff argues that the "actions and circumstances" of the parties' demonstrated their "intention to be bound by the terms of the contract." (Dkt. No. 20 ("Opp.") at 7.) But this argument presupposes that "the contract" already existed when the parties carried out their conduct, rather than the parties' conduct itself bringing the contract into existence. Further, nothing Plaintiff alleges about the parties' conduct from 2011 until 2021 suggests Defendant was contractually obligated to provide territorial obligations to Plaintiff. Plaintiff's claim that an implied-in-fact contract existed therefore fails.

- 8 -

However, Plaintiff does plead facts sufficient to allege that an oral agreement existed. (Compl. ¶ 14, 24, 36-37; *See also* Dkt. No. 25 ("Response") at 6.) "For an oral contract to exist, the parties must have had a meeting of the minds with respect to the terms of the agreement and must have intended to be bound to the oral agreement." *Podolsky v. Alma Energy Corp.,* 143 F.3d 364, 369 (7th Cir. 1998) (applying Illinois law). "Oral agreements are binding so long as there is an offer, an acceptance, and a meeting of the minds regarding the terms of the agreement." *Leavell v. Dep't of Nat. Res.,* 923 N.E.2d 829, 841 (Ill. App. Ct. 2010). Plaintiff must also establish "definite and certain terms" to plead an enforceable oral contract. *Britton v. ITT Tech. Inst.,* 2014 WL 1568684, at *4 (N.D. Ill. Apr. 17, 2014) (citing *Mannion v. Stallings & Co.,* 561 N.E.2d 1134, 1138 (Ill.App.Ct.1990)).

Defendant launches several other attacks on Plaintiff's argument that a contract existed. The Court disagrees with Defendant's first argument that "Plaintiff alleges no details of the terms of an alleged oral or implied contract" that establishes a meeting of the minds. (Dkt. No. 11 ("Mot.") at 7.) Plaintiff alleges that Osiecki, on behalf of Shell, proposed that Plaintiff purchase the property under the limitations of a restrictive deed, purchase this fuel from a Shell distributor, rehabilitate the property, and accept only Shell brand credit cards. (Compl ¶¶ 9-

11, 20, 25, 32.) Shell in return offered to provide Plaintiff with territorial exclusivity, as well as access to its logos and promotional material. (Compl. ¶¶ 14, 16, 77.) Neither party cites on-point authority on this claim. However, the Court finds the alleged terms in this case substantially differ from cases in this district where the terms were not sufficiently "definite and certain" under Illinois law. *Global Tech. & Trading, Inc. v. Satyam Comput. Servs., Ltd.,* 2011 WL 308162, at *1 (N.D. Ill. Jan. 28, 2011) (the only terms described were that Defendant would compensate Plaintiffs for their service in an amount customary in the industry, without any terms governing Plaintiff's responsibilities); *see also, e.g., Kolbe v. CZS Holdings LLC,* 2021 WL 4864143, at *4 (N.D. Ill. Oct. 19, 2021) (finding allegation that ownership shares were "to be provided after the first year" as too indefinite to allege an oral contract). The Court thus finds this sufficiently alleges a meeting of the minds and a mutual intent to enter into a contract. (Compl. ¶¶ 5-6, 18.) And, though the Complaint does not allege that Osiecki specifically represented to Plaintiff that Shell would undergo traffic and customer flow studies prior to authorizing a competing Shell station, at this stage Plaintiff has sufficiently alleged facts that suggest a meeting of the minds existed regarding territorial protections.

Defendant also contests that Plaintiff sufficiently pled the existence of a franchise agreement specifically. The Court does not find it necessary to find that Plaintiff sufficiently alleged an oral franchise agreement as opposed to an oral agreement generally for purposes of this breach of contract claim. Defendant also asserts, without support, that because "franchise agreements are generally detailed comprehensive written documents," Plaintiff's breach of oral and implied-in-fact contract claims should fail. (Mot. at 6–7.) The definition of "franchise" under the Illinois Franchise Disclosure Act — though not at issue here — is instructive. There, "franchise" is defined to include oral and implied agreements. 815 ILCS 705/3 § 3 (1); *See P & W Supply Co. v. E.I. Dupont de Nemours & Co.,* 1991 WL 352614, at *2 (N.D. Ill. Sept. 17, 1991).

The remaining thrust of Defendant's argument that an oral or implied contract would not govern here is that two written contracts — the Retail Sales Agreement between Plaintiff and RS Fuel, and the Retail Sales Agreement between Plaintiff and Shell — necessitate dismissal because both contracts expressly provide that Plaintiff would not have territorial exclusivity. Defendant attaches the former contract to its Motion to Dismiss, and the latter to their Supplemental Motion to Dismiss. (Dkt. Nos. 12, 24.) Neither contract necessitates dismissal.

It is "well-settled in this circuit that documents attached to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to his claim." *Mueller v. Apple Leisure Corp.,* 880 F.3d 890, 895 (7th Cir. 2018), quoting *188 L.L.C. v. Trinity Indus.,* 300 F.3d 730, 735 (7th Cir. 2002) (internal quotation marks omitted). Because the Complaint references the agreement with RS Fuel, the Court considers the document even though Plaintiff did not attach it. (*See* Compl. ¶¶ 17, 91.) Nothing about the agreement between Plaintiff and Shell's wholesaler means Plaintiff and Shell did not have an agreement in which Shell was contractually obligated to honor territorial protections offered to Plaintiff. Defendant provides no support for its assertion that a contract could not have existed between Plaintiff and Shell alongside or after this contract with RS Fuel. (Mot. at 7.)

Nor does Plaintiff's Retail Sales Agreement with Shell entitle Defendants to dismissal. Consideration of this agreement would require the Court to convert this matter into a summary judgment motion because it is not referenced in Plaintiff's Complaint. *Truhlar v. John Grace Branch No. 825 of the Nat'l Ass'n. of Letter Carriers,* 2007 WL 1030237, at *12 (N.D. Ill. Mar. 30, 2007) (citing FED. R. CIV. P. 12(b)). Because consideration of this contract would not facilitate disposition of this matter —

Plaintiff and Shell could have orally agreed to terms on territorial exclusivity after the termination of the contract in 2010 — the Court declines to consider the document.

The Plaintiff adequately alleges the remaining requirements for a breach of contract claim — breach and resulting loss. Plaintiff alleges that Defendant failed to undergo the requisite studies and tests prior to authorizing the competing Shell station in breach of the oral agreement, and that, as a result of this breach, Plaintiff's station lost half of its gross fuel sales volume. (Compl. ¶¶ 54, 70–71.)

Accordingly, the Court denies Defendant's Motion to Dismiss Count I.

### B. Count II — Illinois Consumer Fraud Act

Plaintiff brings Count II against Defendants for violation of the Illinois Consumer Fraud Act ("ICFA"). (Compl. ¶¶ 76–80); 815 ILCS 505. The ICFA protects consumers against unfair methods of competition or deceptive acts or practices by barring "any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice . . . ." 815 ILCS 505/2. The Act defines merchandise under the state as "any objects, wares, goods, commodities, intangibles,

- 13 -

real estate situated outside the State of Illinois, or services."
815 ILCS 505/1(b). To have standing under the ICFA, the claimant
must be considered a "consumer" under the statute.

Plaintiff argues that Shell's authorization of a competing
Shell fuel station "constitutes an unfair and deceptive act"
inconsistent with its franchise policy and contrary to the
representations Shell agents made to Plaintiff. Defendant disputes
that Plaintiff has standing to bring the claim because Plaintiff
is not a "consumer" under the act. The law defines "consumer" as
"any person who purchases or contracts for the purchase of
merchandise not for resale in the ordinary course of his trade or
business but for his use or that of a member of his household."
815 ILCS 505/1(e).

The Court agrees with Defendant that Plaintiff does not have
standing under the ICFA because it cannot be considered a
"consumer." Courts in this circuit have consistently rejected the
logic Plaintiff advances that a franchisee may be considered a
consumer under the act. *See Hashmi,* 2020 WL 586822, at *3 (finding
plaintiffs could not be consumers as franchisees); *Chi. Male Med.
Clinic, LLC v. Ultimate Mgmt., Inc.,* 2012 WL 6755104, at *5 (N.D.
Ill. Dec. 28, 2012) ("[T]he Court cannot fathom any way that
consulting or franchise services could be used for personal use as
the statute requires."); *Shipman v. Case Handyman Servs., L.L.C.,*

- 14 -

446 F.Supp. 2d 812, 814 (N.D. Ill. 2006) (franchisees "are not consumers . . . under the statute").

Further, although Plaintiff is not precluded from being considered a "consumer" under this act merely because it is a corporation, courts in this district have endorsed a narrow reading of "consumer" that does not include "business purchasers." In *Lululemon USA, Inc. v. 108 N. State Retail, LLC,* an apparel company argued it was a consumer because it had purchased retail space. 2009 WL 1732103, at *4 (N.D. Ill. June 17, 2009). Explaining that "the lease of the space [wa]s a necessary prerequisite for [L]ululemon to engage in the sale of its product," the court found *Lululemon* fell outside the Act's definition of a consumer. *Id.*; *see also Gelco Corp. v. Major Chevrolet, Inc.,* 2002 WL 31427027, at *10 (N.D. Ill. Oct. 10, 2002) (applying similar logic to financing and retail agreements); *Hashmi v. 7-Eleven, Inc.*, 2020 WL 586822, at *3 (N.D. Ill. Feb. 6, 2020) ("Generally, however, a business purchaser is not a consumer because his only use of the purchased product is as an input into the making of a product that he sells.") (internal quotations omitted). The facts here are similar to *Lululemon* and *Gelco.* Assuming, *arguendo,* that franchise rights may be considered "merchandise," these rights undoubtedly permitted Plaintiff to sell its fuel and carry out its business and thus were not for "personal use."

Plaintiff may nevertheless have standing if the Complaint
pleads facts that satisfy the "consumer nexus" test, even if it
cannot be considered a "consumer" under the ICFA. *Lululemon,* 2009
WL 1732103, at *4. To plead sufficiently a consumer nexus, a
plaintiff must allege Defendant's conduct was "of [a] sufficient
magnitude to be likely to affect the market generally." *Williams
Elecs. Games, Inc. v. Garrity,* 366 F.3d 569, 579 (7th Cir. 2004).
The Court finds no facts in the Complaint that suggest Defendant's
conduct was directed towards the market generally, or "otherwise
relat[ed] to consumer protection issues." *Lululemon,* 2009 WL
1732103, at *5.

Because Plaintiff lacks standing to bring a claim under the
ICFA, the Court grants Defendant's Motion to Dismiss Count II.

### C. Count III – Tortious Interference with Prospective Economic Advantage

In Count III, Plaintiff argues that Defendant, with knowledge
of Plaintiff's reasonable expectancy to continue regular business
relationships with its customers, unfairly interfered with this
expectancy by authorizing the competing Shell station "in direct
violation of Shell's established standards and treatment of its
branded fuel stations." (Compl. ¶¶ 81–88.)

Under Illinois law, "the tort of interference with
prospective economic advantage has four elements: (1) plaintiff
must have a reasonable expectancy of a valid business relationship

with a third party; (2) defendant must know of the prospective business relationship; (3) defendant must intentionally interfere with the prospective business relationship such that the prospective business relationship never materializes; and (4) the interference must damage the plaintiff." *Interim Health Care of N. Ill., Inc. v. Interim Health Care, Inc.,* 225 F.3d 876, 886 (7th Cir. 2000) (internal quotations omitted).

Defendant primarily relies on the Retail Sales Agreement with Shell in arguing Plaintiff failed to state a claim of tortious interference. Defendants argue that because of the contract's no territorial exclusivity term, Plaintiff could not have had a reasonable expectancy in continuing their regular business relationship with their customers, nor could Defendant have known of such an expectancy. As previously stated, the Court will not take judicial notice of this agreement.

The Court finds that Plaintiff fails to state a claim of tortious interference for a different reason. There is nothing in Shell's authorization of the competing Shell fuel station that suggests intentional interference with Plaintiff's regular customers. While it is not necessary for Plaintiff to allege with specificity the "third party or class of third parties with whom it claims to have had a valid business expectancy," or even that an actual contract exists between a plaintiff and the third party,

it is well established that the "tortious interference allegedly
committed by the defendant must be directed toward the third party
or parties with whom the plaintiff had the business expectancy."
*Int'l Star Registry of Ill. v. ABC Radio Network, Inc.,* 451 F.Supp.
2d 982, 992 (N.D. Ill. 2006) (internal quotations omitted) (citing
*Fredrick v. Simmons Airlines, Inc.,* 144 F.3d 500, 503 (7th Cir.
1998)); *see also Pittsfield Dev., L.L.C. v. Lynd,* 2021 WL 3618275,
at *5 (N.D. Ill. Aug. 16, 2021). Nowhere in the Complaint does
Plaintiff allege that Defendant's authorization of the competing
Shell without appropriate studies was "directed toward"
Plaintiff's regular customers.

Accordingly, the Court grants Defendant's Motion to Dismiss
Count III.

### D.  Count IV – Fiduciary Duty

Count IV is a breach of fiduciary duty claim alleging that
Shell, as the "dominant party in its relationship with Hickory
Hills," and "one of the largest oil companies in the world," with
"superior bargaining power," breached its fiduciary duty of good
faith and fair dealing by authorizing the opening of the competing
Shell station. (Compl. ¶¶ 89–96.)

To state a claim for breach of fiduciary duty, Plaintiff must
adequately allege that Shell owed it a fiduciary duty, and that
duty must exist as a matter of law. *Landale Signs & Neon, Ltd. v.*

- 18 -

*Runnion Equip. Co.,* 2016 U.S. Dist. LEXIS 177195, at *12 (N.D. Ill. Dec. 22, 2016) (citing *Cooney v. Chi. Pub. Schs.,* 943 N.E.2d 23, 29 (Ill. App. Ct. 2010)). Courts in this district are reluctant to recognize a fiduciary duty owed to a franchisee by a franchisor. *Sears Home Appliances Showrooms, LLC v. Appliance All., LLC,* 2017 WL 839483, at *8–9 (N.D. Ill. Mar. 3, 2017) ("general rule that a franchisor does not owe a franchisee a fiduciary duty" because "control by the franchisor is an expected aspect of the commercial relationship."); *see also Sparano v. Southland Corp.,* 1995 WL 470267, at *4 (N.D. Ill. Aug. 4, 1995) (declining to recognize a fiduciary duty on the part of a franchisor because "the very nature of franchise relationships" is such that "the franchisor has a strong interest in maintaining standards, consistency, and a high success rate through the system"). While a relationship between franchisor and franchisee *may* give rise to a fiduciary relationship, it must be "one of particular trust and confidence." *Putzier v. Ace Hardware Corp.,* 50 F.Supp. 3d 964, 979 (N.D. Ill. 2014). Assuming the parties formed a franchise agreement as Plaintiff alleges, Plaintiff failed to allege how the relationship between Shell and Plaintiff "differed from that of a typical franchisor-franchisee relationship." *Sears,* 2017 WL 839483, at *8.

Plaintiff did not base its fiduciary duty claim on the existence of a franchise-specific relationship, nor did it need

to. However, there is nothing in the Complaint that suggests the parties had anything beyond an arms-length business relationship, franchise or not. While Plaintiff alleges it "placed . . . trust in Shell when it rehabilitated and reopened the abandoned gas station," (Compl. ¶ 90), Plaintiff also concedes that it was entitled to "receive . . . standard Shell territorial protections in exchange for" these rehabilitation efforts (Compl. ¶ 77). The parties here simply transacted a business deal, and "[a]rms-length business transactions. . . do not ordinarily give rise to fiduciary duties — even where one party has a slightly dominant business position." *KFC Corp. v. Iron Horse of Metairie Rd., L.L.C.,* 2020 WL 3892989, at *10 (N.D. Ill. July 10, 2020) (internal quotations omitted) (citing Illinois law).

Accordingly, Defendant's Motion to Dismiss Count IV is granted.

### IV.   **CONCLUSION**

For the reasons stated herein, the Court grants Defendant's Motion to Dismiss Counts II, III, and IV.  Counts II, III and IV are dismissed with prejudice.  The Court denies Defendant's Motion to Dismiss Count I.

**IT IS SO ORDERED.**


_____
Harry D. Leinenweber, Judge
United States District Court


Dated: 6/29/2023